P1uWpujS

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                            24 Cr. 442 (NRB)

SARAH VALERIO PUJOLS,

              Defendant.
                                         Sentence
------------------------------x

                                         New York, N.Y.
                                         January 30, 2025
                                         2:00 p.m.

Before:

              HON. NAOMI REICE BUCHWALD,

                                         District Judge

                        APPEARANCES

DANIELLE R. SASSOON
     United States Attorney for the
     Southern District of New York
BY:  BENJAMIN A. GIANFORTI
     Assistant United States Attorney

TAMARA L. GIWA
     Federal Defenders of New York, Inc.
     Attorney for Defendant
BY:  MARISA K. CABRERA
     Assistant Federal Defender

Also Present:  Ashley Toribio, Paralegal
```

1                (Case called; appearances noted)

2                THE COURT:  Everyone may be seated.

3                As it's clear everybody's aware, the purpose of

4    today's proceeding is to determine the sentence for Ms. Pujols,

5    given her plea of guilty.  So let me begin, as I always do, by

6    making sure that I have all the documents that have been

7    submitted in connection with the proceeding:

8                First is the report from the probation department, the

9    presentence investigation report.  It bears a revised date of

10   October 28 of 2024;

11               Next, there's the submission by Federal Defenders with

12   an impressive collection of letters from family and friends;

13   and

14               Finally, the government's submission, which was filed

15   on January 21 of this year.

16               I might have forgotten to say that the Federal

17   Defenders submission is dated January 9 of this year.

18               Let me confirm that both sides have received a copy of

19   the presentence investigation report.

20               MR. GIANFORTI:  Yes, your Honor.

21               MS. CABRERA:  Yes.

22               THE COURT:  Are there any objections to it?

23               Mr. Gianforti.

24               MR. GIANFORTI:  No.

25               THE COURT:  Ms. Cabrera.

1            MS. CABRERA:  No, your Honor.
2            THE COURT:  Ms. Cabrera, have you had a chance to
3    review the presentence report with your client?
4            MS. CABRERA:  Yes, your Honor.
5            THE COURT:  Do you have any objections to it?
6            MS. CABRERA:  No, your Honor.
7            THE COURT:  Did you review with her the requested
8    special conditions of supervised release that were proposed by
9    the probation department?
10            MS. CABRERA:  Yes, your Honor.
11            THE COURT:  And did you have any objection to any of
12   them?
13            MS. CABRERA:  No, your Honor.
14            THE COURT:  All right.
15            Ms. Cabrera, I'm going to give you the floor.
16            MS. CABRERA:  May I move?
17            THE COURT:  Any place you want.
18            MS. CABRERA:  OK.  Thank you, Judge.
19            THE COURT:  Whatever's comfortable.
20            MS. CABRERA:  Thank you, your Honor.
21            A nonincarceratory sentence is appropriate here, we
22   believe, in this case under the circumstances.
23            Ms. Valerio is a nonviolent, zero-point offender, who
24   accepted an opportunity to carry money from a childhood friend
25   and deliver it to his family in the Dominican Republic for him.

1    And she agreed to do this during a period in time that was one
2    of the most challenging times in her life, periods of her life,
3    when she was trying to conceive a child, which she had been
4    attempted to do for years.  The costs of these fertility
5    treatment were overwhelming for her.  The shame of being unable
6    to carry a child without medical intervention deeply
7    embarrassed her.  And it was against this backdrop that she
8    made this decision, and a wrong decision.  And it's a decision
9    she deeply regrets, but she fully acknowledges that it was her
10   decision alone.
11           Now, while Ms. Valerio's codefendant, Charlie
12   Hernandez, received a sentence of three months of
13   incarceration, we do not think that that is the appropriate
14   sentence here for Ms. Valerio.  And I do think that there are
15   actually, in fact, multiple factors that distinguish
16   Ms. Valerio from Charlie Hernandez that warrant a noncustodial
17   sentence.
18           First, the obvious, I think, is the fact that she does
19   have a young child, who's actually present today, that she's
20   the primary caretaker of.  Her family lives in Missouri, her
21   immediate family.  Most of the folks in here today are actually
22   friends, and I think there are two cousins here, but it's such
23   an amazing show of support for Ms. Valerio today.  But as all
24   of their letters have indicated, she is the primary caretaker
25   for their four-year-old son.

1              Her husband is incredibly worried as to how they'll
2     manage without her. He's the primary breadwinner. They are
3     unable to afford child care without Ms. Valerio being able to
4     stay at home with him. And again, this isn't just simply a
5     sentiment expressed by her husband. It's expressed in those 34
6     letters of support.
7              Second, she has a job awaiting her, depending on the
8     outcome of the case.
9              Now, during the pendency of this case, when she was
10    first arrested, Ms. Valerio was working as a home health aide
11    for her mother, who was quite ill. In the midst of it, her
12    mother moved to Missouri, and so she was no longer working as
13    her health aide and kind of first got a taste of the challenges
14    associated with a criminal prosecution and eventually a
15    conviction in that the background checks started coming through
16    when she was applying for jobs.
17             And so despite these challenges, she was able to
18    secure something, through CVS, as a bilingual customer service
19    representative in October of 2024. However, after the
20    background check, when they realized that this sentencing was
21    pending, they had asked her to delay her start date until
22    afterwards.
23             As of last week, on January 23 of 2025, she was still
24    contacted by CVS, asking for the status of the sentencing. And
25    what that means, to us and I think the reasonable inference is

1  that if she does remain at liberty, it does seem as though
2  there's a job still waiting for her.  If she's detained, it's
3  unlikely that they're going to hold this position open for her
4  until she concludes her sentence, which would certainly be a
5  shame, because it was quite hard for her to find a job.
6          You know, as I mentioned, the impacts of a felony
7  conviction are already being felt by Ms. Valerio, and it's hard
8  to imagine that a three-month sentence or really any sentence
9  is worth the cost of the new employment, especially when
10 studies have shown time and time again that successful --
11 employment goes hand in hand with successful reintegration into
12 the community.
13         Now, a third point is that I think it's worth noting
14 that Mr. Hernandez seemingly had a different level of
15 involvement than Ms. Valerio, and he did face higher guidelines
16 than Ms. Valerio, which I think should also be considered when
17 fashioning a sentence here.
18         Mr. Hernandez's guideline sentence was based on
19 $120,000 versus Ms. Valerio's, I think, 61,000, and the
20 allegations were that he delivered half the money to
21 Ms. Valerio, which seemingly meant that he was -- it wasn't
22 just simply that he was carrying the money, but he was also
23 divvying it up to different people.  And I do think that's
24 worth considering here.
25         And it's also my understanding that Mr. Hernandez knew

1  definitively that these were the proceeds of drug money,
2  whereas, here, it's that Ms. Valerio should have known.  She
3  was never directly told by her childhood friend that these were
4  drug proceeds money.  And you know, I think that there is -- I
5  also think, lastly, that there's something to be said about
6  Ms. Valerio's motives here.
7         Her motives were incredibly different than
8  Mr. Hernandez's, and I do believe that warrants consideration
9  as well.  She did this to finance the exceedingly high costs of
10 her fertility treatments, treatments that her long-time friend
11 who asked her to do this had even, like, participated in
12 counseling her through and even was present in the waiting room
13 when she was getting her IUI procedures done.  He knew her
14 desperate circumstances and offered her an opportunity to ease
15 the financial burden of it.  Obviously, it's an opportunity
16 that she deeply regrets now, having to accept it now.
17         But unlike Hernandez, who the government described his
18 actions to be, quote, somewhat inexplicable from a financial
19 standpoint, end quote, Ms. Valerio was not acting out of a
20 place of greed or indifference but really of desperation, which
21 unfortunately blinded her here.  She's a good person.  There's
22 just no question of it.  The 34 letters of support, which is
23 the most that I've seen in my career here, I think, show you
24 how deeply loved she is by so many people.  And you just don't
25 get 34 letters of support without being a really good, stand-up

1    person.

2            THE COURT:  Having been around this courthouse

3    considerably longer than you, I would say that in a case of

4    this magnitude, this is the most letters I've ever seen.

5            MS. CABRERA:  And I think that's incredibly telling,

6    your Honor.

7            As Ms. Valerio will be the first to tell you, you

8    know, good people sometimes make the wrong choices, which is

9    certainly what's happened here.  And she's already certainly

10   feeling the consequences of that.

11           Jail is simply not necessary for Ms. Valerio, a first

12   time and zero-point offender.  She's been at liberty, living a

13   law-abiding life for nearly five years before being arrested

14   here.  She's been exceptionally compliant with the terms of her

15   pretrial release.  This experience, though, has really pulled

16   the rug out from under her, and while we understand the

17   seriousness of the offense and the conduct here, I think it's

18   clear that there's no doubt that a flight attendant would be

19   fully deterred from seeing the consequences that Ms. Valerio

20   has endured already.

21           She's lost her coveted, really coveted, job as a

22   flight attendant.  They're pretty hard to get.  She's faced

23   federal criminal prosecution.  She's faced incredible

24   challenges in finding a new job, and she's lived with the fear

25   of having to abandon her family and her child because of her

1  own action.  And the reality is, as your Honor already knows,
2  each defendant has to be treated individually and separately at
3  their sentences.  And while a three-month sentence may have
4  been deemed appropriate for Mr. Hernandez in balancing the
5  3553(a) factors for his case, the same cannot be said for
6  Ms. Valerio.
7          A time-served sentence with a term of home
8  incarceration is the appropriate sentence here and, along with
9  all of the other collateral consequences here, will be
10 sufficient punishment and deterrence given the conduct in this
11 case.
12         Unless your Honor has any other questions --
13         THE COURT:  No.
14         Ms. Valerio, would you like to speak now?  You can
15 also have an opportunity to speak after the government speaks.
16         THE DEFENDANT:  I just wanted to let you know that I
17 am deeply remorseful for my actions.
18         I'm sorry.
19         THE COURT:  It's not necessary for you to say
20 anything.  I've read your letter.  If it's really hard for you
21 to speak now, it's OK.
22         THE DEFENDANT:  I'm just sorry. I feel shameful.  I
23 feel like I let my friends, my family, my son down.  But I just
24 want you to know that I am a good person.  What -- that person
25 on that paper is not me.  I had -- I made a wrong decision, but

1   I'm a good person.  I'm a good mom, and I'm a great friend.
2   And I just wanted to let you know that.
3           THE COURT:  Let me hear from the government.
4           MR. GIANFORTI:  Your Honor, unless you have any
5   questions for me, we'll rest on our submission.
6           THE COURT:  I do.
7           Can we all agree that we're not really concerned that
8   Ms. Valerio is ever going to commit another crime again?
9           MR. GIANFORTI:  I would agree with that.
10          THE COURT:  Then your argument is not one of specific
11  deterrence.  It's one of general deterrence.  Could you tell me
12  why it would not be either equally or more deterrent for the
13  government, TSA, I guess it is, to do random serious searches
14  of airline personnel who normally walk through with less
15  intrusive searches if they knew that randomly they really could
16  be searched?  Don't you think that would deter them more than
17  putting someone in jail for three months?
18          MR. GIANFORTI:  So, your Honor, I agree that it would
19  have a deterrent value if there was more certainty around
20  screening.
21          THE COURT:  That's in the control of the government,
22  in control of the executive branch, how often they want to do
23  it.  They certainly screen the rest of us.  We don't get to
24  walk through, even if we're federal judges.  We get a better
25  line.

1          MR. GIANFORTI:  That's something.

2          THE COURT:  That is something.  Absolutely it's

3    something; it's one of the few perks of the job.

4          But there is no preset limit to how many searches they

5    could make, and it just seems to me that if the word got out

6    and it was acted on, that would be a very effective deterrent.

7          MR. GIANFORTI:  Your Honor, I agree with you that if

8    the TSA were to up its game, shall we say, with respect to

9    people who happen to know this criminal status, that would

10   indeed be a good general deterrent in this area.

11         Also, your Honor, one of the things I learned in the

12   course of this investigation is that the airlines themselves

13   seemed to have been sort of blindsided by this kind of conduct.

14   I spoke to Jet Blue.  I think I spoke to Delta, and I don't

15   think any of them had within their training for incoming flight

16   attendants sort of a basic understanding of customs laws and

17   regulations around declaring cash, not moving cash.  So the

18   government hopes that not only on the public sector side there

19   will be a deterrent effect but also on the private sector side.

20   But I think, your Honor, that absent that, and I'm not aware of

21   there being any changes, there's still a need for general

22   deterrence here because your average flight attendant might see

23   that and say, well, I've never been screened before; I don't

24   see an uptick in screening for people like me, I'm making money

25   doing this.

1          And so there's a need here for an incarceratory
2  sentence to send a message that this kind of conduct will be
3  immediately punished.
4          THE COURT:  Well, that makes a big assumption that
5  anyone's going to learn about it.  And frankly, recently, a
6  sentence of mine, I put somebody in jail for 30 years because
7  they had been dealing with heroin laced with fentanyl resulting
8  in basically eight known deaths, there was not one bit of
9  publicity.  And a lesser sentence probably was sufficient for
10 the person.  So I'm not so confident that there's going to be
11 the type of publicity that would have an impact.  Instead, it
12 seems to me that the government writ large can take the steps
13 to send fear into the views of any airline personnel who get
14 through easily.  And it seems to me, frankly -- and I've
15 thought about this over the years -- that we ought to learn,
16 the government ought to learn, from criminal prosecutions as to
17 where the flaws are in how the government functions.
18         For example, I had one of the many tax cases where
19 preparers create additional dependents from the sky, and yet
20 you can go after that person.  You can put them in jail, but
21 wouldn't it make more sense if money was invested in the IRS so
22 they had a computer system which said, oh, in year one, this
23 person had one kid.  In year two they had four.  Probably we
24 should look into that, because there aren't that many triplets
25 born.  But that never happened.  And it wasn't that it was

1  wrong to put that person in jail, but the solution was obvious
2  and so much more effective than having caught people who were
3  cheating on their taxes so the rest of us could pay more.
4          I think you probably have a sense of where I'm going.
5          MR. GIANFORTI:  I do, your Honor.
6          THE COURT:  OK.
7          Ms. Valerio, I'm not putting you in jail.  OK?  I
8  don't think it would serve any good purpose and would cause a
9  lot of harm.
10         Unlike some situations where defendants appeal to me
11 because of their children, my reaction to that is, normally,
12 you should have thought about that before you committed your
13 crime.  In your case, there was no child at the time this crime
14 was committed.  And let me say that I'm not condoning what you
15 did -- it's wrong -- but the question is what price do you pay
16 for it.  And I think you've paid enough of a price.
17         This is no doubt -- I don't really know, and I should
18 have asked the government.
19         Why was there such a gap between the time that they
20 found the money and she lost her job and the filing of the
21 charges here?
22         MR. GIANFORTI:  So, your Honor, the honest answer is
23 this case was handled by multiple AUSAs.  I'm not the first,
24 and it just took a while.
25         THE COURT:  Then there's a period of time where, I

1  don't know, but Ms. Valerio may well have been thinking about
2  this, you know, in the middle of the night and wondering if
3  anything else was going to happen, and this, of course, being
4  the recent time period.  So I'm not even sure exactly what the
5  purpose of home confinement here would be.  It seems to me that
6  essentially her life is home confinement.
7          I remember those days, and so if I put her on home
8  confinement, I'd let her out to take her kid to school.  I'd
9  let her out for every doctor's appointment.  I would let her
10  out for a whole bunch of, to go to church or do things.  It
11  seems to me she's basically home.  If the government has a
12  suggestion as to how that would be meaningful, I'm happy to
13  order it, but it seems to me that's the life she lives now,
14  because there's no electronic monitoring.  It's really you have
15  to be home unless you have a really good reason to leave the
16  house.  And I suspect that is essentially when she leaves the
17  house.
18          So I think I'll leave it at time served, and she's
19  placed on supervised release for one year.
20          I signed the forfeiture order.  That, of course, is a
21  massive sum of money and is part of the punishment.  There's
22  also a $100 special assessment.
23          As far as the supervised release, the mandatory,
24  standard and special conditions are imposed.
25          I'm sure, I assume, that the plea agreement contained

P1uWpujS

1  a waiver of the right to appeal, but just in case, I'll mention
2  again that there's 14 days to do so.
3          Is there anything else?
4          MR. GIANFORTI:  Not from the government.
5          MS. CABRERA:  Not from the defense.  Thank you, your
6  Honor.
7          THE COURT:  Very good.  Thank you.
8          (Adjourned)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25