UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>JAROL FABIO,<br><br>              Defendant. | 24 Cr. 481 (AS) |

## GOVERNMENT'S SENTENCING MEMORANDUM

 

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
Attorney for the United States of America

Benjamin A. Gianforti
Assistant United States Attorney
 -Of Counsel-

**Table of Contents**

I. Background .................................................................................................................. 2

    A. Offense Conduct ............................................................................................. 2

        1. KCM Status and Money Transmission Laws ............................... 2

        2. CW-1's MLO ................................................................................ 3

    B. Procedural History .......................................................................................... 4

    C. The Sentencing Guidelines .............................................................................. 5

    D. Prior Sentencings in this Matter ...................................................................... 5

II. Argument ..................................................................................................................... 7

    A. The Governing Legal Framework ................................................................... 7

    B. The Court Should Impose a Sentence of 3 Months' Imprisonment ............... 10

        1. The Nature and Seriousness of the Offense, and the Need
to Provide Just Punishment ......................................................... 10

        2. The Need to Promote Respect for the Law and to Afford
Adequate Deterrence ................................................................... 11

        3. The History and Characteristics of the Defendant ..................... 12

III. Conclusion ................................................................................................................. 13

For a period of approximately 6 years, former flight attendant Jarol Fabio moonlighted as a money mule for an international money laundering operation ("MLO") that funneled drug money from New York City to the Dominican Republic. As a flight attendant for Delta Airlines ("Delta"), Fabio was the perfect mule because he had "Known Crewmember" ("KCM") status with the Transportation Security Administration ("TSA"), which allowed him to slip through airport security in the dedicated KCM lane at JFK International Airport ("JFK") with little to no scrutiny. In exchange for a few percentage points on each money run, Fabio would smuggle bulk cash generated from local narcotics sales through airport security and then hand it off to another member of the MLO in the Dominican Republic. He did this repeatedly, apparently never stopping to consider that he was fueling the scourge that is the international drug trade. He was part of a network of flight attendants who did this for the MLO, and only stopped in 2023, not because of a change of heart, but because that was the last time that the Government directed the cooperating witness who ran the MLO ("CW-1") to ask Fabio to move money for him.

The United States Probation Office ("Probation") calculates the sentencing Guidelines applicable to Fabio as 18 to 24 months' imprisonment, and recommends a below-Guidelines sentence of 10 months' imprisonment. Fabio asks for even greater leniency in seeking a sentence of time served, plus a period of supervised release. Though the offense conduct at issue here was very serious, the Government respectfully suggests a middle path of a short sentence of 3 months' imprisonment, to be followed by 3 years' supervised release, due to the unique mitigating factors relevant

to this defendant. Such a sentence is well supported by the record and would be sufficient but not greater than necessary to serve the ends of Section 3553(a).

**I.    Background**

    **A.    Offense Conduct**

        **1.    KCM Status and Money Transmission Laws**

Large-scale narcotics suppliers who ply their wares in the United States often end up with the problem of having a significant amount of cash on hand in the United States that they would like to have access to and spend back home. (PSR ¶¶ 11-14). Unable to reliably use traditional banks to wire this cash out of the country, for fear of detection and interdiction, drug dealers often come up with more creative ways of getting their money into their pockets. (*Id.*) One common tactic favored by drug dealers based in the Dominican Republic is to enlist flight attendants who work routes between the United States and the Dominican Republic to smuggle large quantities of cash out of the country in exchange for a small percentage of the proceeds smuggled. (*Id.*). In one key respect, flight attendants make ideal money mules: they typically benefit from KCM status with the TSA, which in most cases allows them to breeze through airport security via a dedicated lane without being meaningfully searched. (PSR ¶¶ 14-18). The defendant had KCM status at all relevant times. (PSR at 29).

Transmission of funds in this way, without a license to do so, is a criminal offense under federal law and the laws of the State of New York. *See* 18 U.S.C. § 1960; N.Y. Banking Law §§ 641, 650. The reason for this is simple: U.S. and New York State authorities seek to disrupt the flow of criminal proceeds just like those at issue here.

2

Licensees are required to, among other things, report suspicious financial activity to relevant authorities as a means of aiding the detection of the movement of funds derived from criminal activity. Under federal law, a money transmitter must obtain a license from the Financial Crimes Enforcement Network, a division of the U.S. Treasury. (*See* PSR ¶ 20). Under New York law, a money transmitter must obtain a license from the New York State Department of Financial Services. (*See* PSR ¶ 19). Fabio has never held a federal or state license to operate a money transmission business. (PSR ¶ 22).

### 2. CW-1's MLO

In October 2021, the Government charged an individual ("CW-1") with money laundering and narcotics offenses in connection with CW-1's operation of the MLO into which CW-1 recruited Fabio in or about 2017. (PSR ¶ 15). CW-1 began cooperating with law enforcement soon after being charged and helped the Government build a case against Fabio and other flight attendants that CW-1 used to move drug money from New York City to the Dominican Republic. CW-1 has moved millions of dollars for drug dealers in the Dominican Republic. These dealers are known to traffick in, among other things, fentanyl. (PSR ¶ 11). CW-1 personally sold significant quantities of oxycodone, some of which was laced with fentanyl, to undercover agents prior to being charged.

Over the course of the approximately 6 years that Fabio moonlighted as a money mule for CW-1's MLO, CW-1 estimates that Fabio smuggled at least $1.5 million in narcotics proceeds out of the United States at CW-1's direction. (PSR ¶ 28).

3

The Government estimates that Fabio earned thousands of dollars from this side hustle, based on CW-1's estimates of the total amount of cash Fabio smuggled and the low percentage-point fee Fabio charged for this service. Fabio knew he was moving drug money. (*Id.*).[1]

On or about May 17, 2023, CW-1, at the direction of law enforcement, exchanged text messages with Fabio and arranged for Fabio to pick up approximately $60,000 in law enforcement funds represented to be the proceeds of narcotics trafficking. (PSR ¶ 29). CW-1 and Fabio met up in Manhattan, where CW-1 gave Fabio the cash; the meeting was recorded). (*Id.*). The next day, CW-1 and Fabio coordinated regarding the pickup of the cash in the Dominican Republic. (PSR ¶ 30). The day after, Fabio flew to the Dominican Republic and handed off approximately $57,900 to another cooperating witness, keeping approximately $2,100—Fabio's fee—for himself. (*Id.*).

### B.   Procedural History

On April 30, 2024, United States Magistrate Judge Sarah L. Cave issued a criminal complaint charging Fabio with operation of an unlicensed money transmission business, in violation of 18 U.S.C. §§ 1960 & 2; conspiracy to operate an unlicensed money transmission business, in violation of 18 U.S.C. §§ 371 & 1960; bulk cash smuggling, in violation of 31 U.S.C. §§ 5332 & 2; and entering an airport or

---

[1] Fabio attempts to discount his culpability for the first time in his sentencing submission, never having raised any such objections to the PSR. (Docket Entry 47 at 2). The fact remains, however, that he moved substantial amounts of drug money for CW-1 for years, earning thousands of dollars as his reward for repeatedly abusing his KCM status.

4

aircraft area in violation of security requirements, in violation of 49 U.S.C. §§ 46314(a) and (b)(1). Fabio was arrested on May 7, 2024, and presented before United States Magistrate Judge Gary Stein. (PSR ¶ 33). Fabio was bailed and has been on pretrial supervision since his arrest, with no issues complying with the terms of his release.

On August 13, 2024, Fabio pleaded guilty before the Court, pursuant to a plea agreement, to an information charging him with a single count of violating 18 U.S.C. §§ 1960 & 2, in connection with his involvement in CW-1's MLO.

### C. The Sentencing Guidelines

The Government and Probation arrived at the same Guidelines calculation in this matter: a base offense level of 14, pursuant to U.S.S.G. § 2S1.1(a)(2); a six-level enhancement because the defendant knew that the laundered funds were the proceeds of narcotics activity, pursuant to U.S.S.G. § 2S1.1(b)(1); a three-level deduction for acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a)-(b); and a further two-level deduction under the Zero-Point Offender Guideline, pursuant to U.S.S.G. § 4C1.1(a), for a total offense level of 15. Fabio has no criminal history and therefore is in Criminal History Category I. His stipulated Guidelines Range under the plea agreement is 18 to 24 months' imprisonment. (*See* PSR ¶ 5).

### D. Prior Sentencings in this Matter

On December 20, 2024, United States District Judge Ronnie Abrams Sentenced Charlie Hernandez, another flight attendant CW-1 used to transfer drug

5

money from the United States to the Dominican Republic, to 3 months imprisonment.[2] *See United States v. Hernandez,* 24 Cr. 447 (RA). Judge Abrams noted that the 3553(a) factors that were most critical to her reasoning were "general deterrence and recognizing the seriousness of the crime." (Tr. 18).

With respect to the seriousness of the offense, Judge Abrams noted, among other things, that far from being an isolated "short lapse in judgment….this was five years, with the government estimating that [Hernandez] laundered approximately two and a half million dollars, even if he only received a small portion in return. And he only stopped because he saw someone else [the defendant] get arrested." (Tr. 21). Judge Abrams also focused on the fact that Hernandez had moved funds linked to the international fentanyl trade, which "cause[s] real harm to real people," noting that she had "had a number of cases since [becoming] a judge where people have died of fentanyl overdoses." (Tr. 21-22). "[T]hese organizations can't function without getting their proceeds…and you helped in that process. And, as I said, you didn't do it for a week or two weeks or even a year. You did it for five years." (Tr. 22).

With respect to the need for general deterrence, Judge Abrams noted that she thought a 3-month term of imprisonment would result in real "deterrence within this community of flight attendants and others who work in that industry." (Tr. 23; *see also* Tr. 16-17, 29).

---

[2] A copy of the transcript of that proceeding is attached here as Exhibit 1. References thereto use the designation "Tr.__."

6

On January 30, 2025, United States District Judge Naomi Buchwald sentenced Sarah Valerio Pujols, a third flight attendant from CW-1's MLO, to time served and one year of supervised release. *See United States v. Valerio Pujols*, No. 24 Cr. 442 (NRB).[3]

## II. Argument

### A. The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range": that "should be the starting point and the initial benchmark." *Gall v. United States*, 55 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 578 U.S. 189, 200, 204 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)); *see also, e.g., United States v. Solis*, 18

---

[3] The Government charged two other flight attendants as part of its takedown of CW-1's money mule network: Emmanuel Torres and Johanna De Jesus. Both have also pleaded guilty to a Section 1960 charge, pursuant to a plea agreement. Torres is currently due to be sentenced by United States District Judge Colleen McMahon on March 5, 2025 and De Jesus is currently due to be sentenced by United States District Judge Edgardo Ramos on March 20, 2025. *See United States v. Torres*, No. 24 Cr. 474 (CM); *United States v. De Jesus*, No. 24 Cr. 577 (ER).

7

F.4th 395, 405 (2d Cir. 2021) ("District courts are to use the Guidelines as a 'starting point' and then make an independent sentencing determination, taking into account the 'nature and circumstances of the offense and the history and characteristics of the defendant' and all other statutory factors.").

After that calculation, however, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); "the kinds of sentences available," 18 U.S.C. § 3553(a)(3); the Guidelines range itself, *see* 18 U.S.C. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see* 18 U.S.C. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," 18 U.S.C. § 3553(a)(6);[4] and "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

---

[4] Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008). Because Section 3553(a)(6) was intended to address national disparities, "a district court may—but is not required to—consider sentencing disparity among co-defendants under 18 U.S.C. § 3553(a)(6)." *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009) (citing *United States v. Frias*, 521 F.3d 229, 236 & n.8 (2d Cir. 2008)). By this same logic, this Court may—but is not required to—consider sentencing disparities with other defendants in this District.

8

  (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  (B)  to afford adequate deterrence to criminal conduct;

  (C)  to protect the public from further crimes of the defendant; and

  (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

  Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

## B.     The Court Should Impose a Sentence of 3 Months' Imprisonment

A sentence of 3 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. The Section 3553(a) factors most applicable in this case include the nature and circumstances of the offense of conviction, the seriousness of the offense, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, the need to avoid unwarranted sentencing disparities among defendants, and the history and characteristics of the defendant. A balance of these factors weighs in favor of the Government's recommended sentence, and against the undue leniency the defendant seeks through his request for a non-custodial sentence.

### 1.     The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment

The nature, circumstances, and seriousness of the offense and the need for just punishment warrant a term of imprisonment. The international drug trade, and particularly the international trade in opioids like fentanyl and oxycodone, is a scourge in the United States. The opioid epidemic in this country has been well documented and has led to many, many destroyed lives, violence, and obscene wealth for large-scale traffickers like those that made up CW-1's client base. The defendant was just a small part of this, but was nonetheless a vital pipeline for the money that keeps this drug trade running and profitable. He knew what this money was and he smuggled it out of the country again and again and again. He could have found other ways to make a little extra money if he needed it, but, no, he decided to go into the money

muling business. Thanks to him, some drug lords in the Dominican Republic are that much richer.

What makes matters worse is that Fabio abused a position of trust bestowed upon him as a flight attendant with KCM status. Fabio knew that he could breeze through airport security at JFK with little to no scrutiny. After CW-1 approached him, he learned that this access could be monetized, which he did over and over again. Airports are in many ways the front lines of national security and law enforcement in this country. They have a unique role in helping to screen and disable potential threats and criminal activity. Fabio thumbed his nose at all of that to make a few bucks.

All of these reasons support a sentence of 3 months' imprisonment.

### 2. The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The need for the sentence to promote respect for the law and to afford adequate deterrence further supports imposition of a sentence that includes a meaningful term of imprisonment. Again, Fabio was well aware of the special access to airports that he was granted by virtue of being a flight attendant with KCM status. But he treated that access like an ATM card, demonstrating a profound disrespect for the law.

While the Government agrees in large part with the defense that the defendant has likely been sufficiently specifically deterred from doing anything like this again, there is still a need for general deterrence here. The Government's arrest of the defendant and the other flight attendants was well-covered in the press and the Government hopes that U.S. airlines have started to make changes to address the risk of

11

abuse that comes along with KCM status. But there is nonetheless a need to demonstrate that this kind of abuse comes with serious consequences, including jail time. The risk is that a slap on the wrist like home confinement will not fundamentally change the calculus for others with KCM status: if people have been slipping through the net for so long, and can easily make extra money, those with KCM status may conclude that it is more than worth the risk of facing a short period of supervised release. The calculus should be that rolling these dice could land you in jail, with no prospect of employment in the airline industry on the other side. Judge Abrams rightly acknowledged this; Judge Buchwald did not, instead blaming *the Government* for not tightening up security so that the Fabio's of the world might think twice before trying their hand at money muling.

### 3. The History and Characteristics of the Defendant

The history and characteristics of the defendant are uniquely mitigating and weigh in favor of a 3-month term of imprisonment, rather than a Guidelines range sentence or even the 10 months suggested by Probation. But they are not so uniquely mitigating as to warrant a non-custodial sentence out of sync with Judge Abrams' 3-month sentence for Charlie Hernandez.

There were similar mitigating considerations for Hernandez, including, among other things, a history of physical and emotional abuse, consistent employment, and serious mental health issues. Fabio, like Hernandez, is also childless; by contrast, Valerio Pujols' young child and caretaking requirements appear to have weighed heavily in Judge Buchwald's analysis.

12

Despite all these mitigating factors, the Government's substantially below-Guidelines recommendation is an appropriate disposition in light of these personal characteristics and the other 3553(a) factors. The Bureau of Prisons will be able to attend to the defendant's needs should the Court agree that a short term of imprisonment is warranted here.

### III.  Conclusion

For the reasons set forth above, this Court should sentence Fabio to 3 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to accomplish the goals set forth in 18 U.S.C. § 3553(a).

Dated:   New York, New York
         February 14, 2025

                                    Respectfully submitted,

                                    MATTHEW PODOLSKY
                                    Acting United States Attorney

                         By:        _____
                                    Benjamin A. Gianforti
                                    Assistant United States Attorney
                                    (212) 637-2490